FILED
CHARLOTTE, NC

# UNITED STATES DISTRICT COURT
## for the
### Western District of North Carolina

APR 2 2018

US District Court
Western District of NC

| United States of America | ) | |
| v. | ) | Case No. 3:18 mj 107 |
| (1) BIREN SHETH | ) | |
| (2) RAFID LATIF | ) | |
| (3) IMTIAZ SHAREEF | ) | |
| (4) EJAZ SHAREEF | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 2009 through the present___ in the county of ___Mecklenburg___ in the ___Western___ District of ___North Carolina___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 371 | Conspiracy to defraud the United States and commit offenses against the United States (including violations of 18 USC 1341, 1343, and 1344) |
| 18 USC 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:

See Affidavit of FBI Special Agent Michael D. McNeely

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Michael D. McNeely, FBI SA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___04/02/2018___

_____
*Judge's signature*

City and state: ___Charlotte, North Carolina___

The Hon. David S. Cayer, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATIONS OF THE UNITED STATES OF AMERICA FOR THE FOLLOWING: | |
| ARREST WARRANT FOR BIREN SHETH | Case No. 3:18 mj 107 |
| ARREST WARRANT FOR RAFID LATIF | **Filed Under Seal** |
| ARREST WARRANT FOR IMTIAZ SHAREEF | |
| ARREST WARRANT FOR EJAZ SHAREEF | |

**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR ARREST WARRANTS**

I, Special Agent Michael D. McNeely with the Charlotte Field Office of the Federal

Bureau of Investigation (FBI), Department of Justice, being duly sworn, state as follows:

**INTRODUCTION**

1.      Your Affiant submits there is probable cause to believe that, from at least as early

as April 2009 through the present, in the Western District of North Carolina and elsewhere,

Biren SHETH, Rafid LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF (collectively

DEFENDANTS) conspired to defraud the United States Small Business Administration (SBA)

and to commit various offenses against the United States, including mail, wire, and bank fraud,

in connection with the ownership and sale of the Arlington Suites Hotel located at 4416 South

1

Tryon Street ("Arlington Suites"), and that DEFENDANTS also conspired to commit to commit money laundering.[1]

2. In particular, your Affiant submits there is probable cause to believe that DEFENDANTS and others conspired to and did execute a scheme to defraud the SBA, as well as others, including multiple financial institutions, through a fraudulent "short" sale of the Arlington Suites from SHETH, the owner, to LATIF, a straw purchaser, in violation of Title 18 United States Code, Section 371. As a result of the fraudulent short-sale scheme, SHETH retained ownership and control of the Arlington Suites, while at the same time eliminating over $1 million of SBA loan debt and increasing his equity in the hotel, and SHETH and LATIF obtained a second SBA loan by concealing the true owner of the hotel.

3. Your Affiant further submits there is probable cause to believe DEFENDANTS facilitated the fraudulent short sale through the execution of a corresponding insurance fraud scheme that yielded illegal proceeds utilized as down-payment earnest money in the short-sale closing. SHETH, LATIF, IMTIAZ SHAREEF and EJAZ SHAREEF benefited from the scheme through the gleaning of nearly $800,000 in insurance fraud proceeds, a portion of which was used as down payment funds in the fraudulent short sale. DEFENDANTS conspired to and did launder the remaining insurance fraud proceeds with the intent to disguise the nature, location, source, ownership, and control of the proceeds of insurance fraud scheme, in violation of Title 18, United States Code, Section 1956(h).

4. This Affidavit is made in support of an Application for Arrest Warrants for SHETH, LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF.

---

[1]The hotel located at this address was initially named the AARCS Residence Suites, but was rebranded Arlington Suites in or about September 2010. The hotel was subsequently converted to a Motel 6 in or about 2015.

2

5.     Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not set forth all of your Affiant's knowledge about this matter.

## AGENT BACKGROUND

6.     Your Affiant is a Special Agent with the Federal Bureau of Investigation, and has been since April of 1998.  Your Affiant is therefore an officer of the United States who is empowered to conduct investigations of, and to make arrests for violations of Federal law. Your Affiant has received training in the investigation of financial crimes in violation of federal law, has investigated numerous financial fraud schemes, and has executed numerous arrest and search warrants during the course of those investigations. Your Affiant has spent the majority of his career on a White Collar Crime Squad in the Charlotte Division of the Federal Bureau of Investigation, and is currently assigned to the Charlotte Division Public Corruption Squad, which maintains investigative responsibility for among other things matters involving fraud against the government.

7.     Your Affiant is familiar with the facts and circumstances of this investigation both as a result of personal participation in the investigation and based on reports made to your Affiant by other law enforcement officers and investigators.  The information contained in this Affidavit is based upon your Affiant's own experience, investigation, and observations, as well as information relayed to your Affiant by others with knowledge of the investigation.

## INDIVIDUALS AND ENTITIES

8.     **Biren SHETH**, also known as Birenkuma Sheth, is a United States Citizen, born in India, whose address is 74 Woodside Ave, West Caldwell, New Jersey 07006.

9.     **Rafid LATIF**, is a United States citizen, born in Pakistan, whose address is 1408 West Sugar Creek Road, Charlotte, North Carolina 28262.

10.    **IMTIAZ SHAREEF**, is a United States citizen, born in Pakistan.

3

11.    **EJAZ SHAREEF**, is a United States citizen, born in Pakistan.

12.    **AARCS Financial Group, Inc. ("AARCS Financial") and Sheth Financial Group LLC ("Sheth Financial")**

    a.    AARCS Financial and Sheth Financial are businesses owned by SHETH, both of which maintain nearly identical websites (www.aarcs.com and www.shethfianancial.com).[2]  Each website describes the business as "a commercial mortgage consulting firm" with "superior knowledge of the hotel lending industry."  In addition, both of SHETH's businesses claim expertise in SBA loan programs and boast "the widest selection of SBA [and other financial products] for Hotel Loans."

13.    **Charlotte National Hospitality, Inc. (CNH)**

    a.    CNH was incorporated on August 8, 2006, through the filing of Articles of Incorporation with the North Carolina Department of the Secretary of State ("NCSOS").

    b.    In subsequent NCSOS filings, CNH listed their mailing address as 4416 S. Tryon Street, Charlotte, NC 28217, which is the address of the Arlington Suites. SHETH was listed with NCSOS as the registered agent and president of CNH. SHETH's address was listed as 74 Woodside, West Caldwell, New Jersey 07006, which public records show as the residential address of SHETH and his wife Alpana Sheth.

---

[2]One difference in the sites is that for AARCS Financial the contact information is listed as "Biren Sheth 74 Woodside Avenue West Caldwell, N.J. 07006," while the Sheth Financial website only lists telephone numbers and an email address.  Both sites show the same phone number for contact (973.364.8435)

4

c. On or about November 1, 2006, SHETH, using CNH, purchased the hotel located at 4416 S. Tryon Street Charlotte, North Carolina, for $4 million using loans from the State Bank of Texas along with an SBA 504 loan in the amount of $1.4 million. After initially naming the hotel AARCS Residence Suites, SHETH renamed the hotel Arlington Suites in or about September 2010.

14. **Shubh Laxmi Charlotte, Inc.**

a. Shubh Laxmi was incorporated on August 22, 2012, through the filing of Articles of Incorporation with the NCSOS. LATIF was listed as the both the registered agent and president.

b. On or about February 13, 2013, CNH/SHETH "sold" the Arlington Suites to Shubh Laxmi, in what the instant investigation shows was a fraudulent short sale from SHETH to straw purchaser LATIF, after which SHETH maintained full control and ownership of the hotel. On or about that same day, LATIF d/b/a Shubh Laxmi obtained an SBA guaranteed loan from Hanmi Bank in the amount of $1,960,000 in connection with LATIF's fraudulent purchase of the Arlington Suites.

15. **The State Bank of Texas** is a bank headquartered in Dallas Texas, whose deposits are insured by the Federal Deposit Insurance Corporation.

16. **Hanmi Bank** is a bank headquartered in Los Angeles, California, whose deposits are insured by the Federal Deposit Insurance Corporation.

17. **Great American Insurance Company** is an insurance company headquartered in Cincinnati, Ohio whose member companies are subsidiaries of the American Financial Group.

18.     **TD Bank, N.A.** is bank headquartered in Cherry Hill, New Jersey, whose deposits are insured by the Federal Deposit Insurance Corporation.

19.     **PNC Bank** is a bank headquartered in Pittsburgh, Pennsylvania, whose deposits are insured by the Federal Deposit Insurance Corporation.

20.     **Bank of America** is a bank headquartered in Charlotte, North Carolina, whose deposits are insured by the Federal Deposit Insurance Corporation.

21.     **BB&T Bank** is a bank headquartered in Winston Salem, North Carolina, whose deposits are insured by the Federal Deposit Insurance Corporation.

## SBA LOAN BACKGROUND

22.     The SBA offers a variety of favorable loan programs for small businesses. Information and details regarding available SBA programs were reviewed by your Affiant through the internet website www.sba.gov as well learned through the course of an interview of an SBA Division Counsel.

23.     In order for a borrower to receive an SBA Loan, the borrower must meet basic eligibility requirements.

24.     The most common SBA loan programs are the 7(a) and 504 loans.

6

a. **The 7(a) loan program** is designed to provide financing for general business purposes and can be obtained directly from the SBA or through a lender/bank for which the loan is guaranteed by the SBA.

b. **The 504 loan program** is designed to provide financing for major fixed assets such as equipment and real estate and is funded through a Certified Development Company (CDC) which must be a non-profit entity authorized by the SBA.

25. Both the 7(a) and 504 SBA loan applications contain "Certification as to Accuracy" language that makes it clear to the applicant that all information provided in the application must be true and accurate, with additional language that provides that to knowingly provide false information to the SBA in the loan process would constitute violations of various federal criminal statutes. Information requested in both loan program applications includes the name of the applicant/borrower along with the borrower's business name.

## THE FRAUDULENT SBA LOAN SCHEME

26. In or about November 2006, using the business name CNH, SHETH obtained an SBA 504 loan through CDC Self Help Credit Union to provide part of the financing for SHETH's purchase of the hotel ultimately named Arlington Suites located at 4416 S. Tryon Street, Charlotte, North Carolina 28217. Specifically, SHETH obtained SBA 504 Loan Number 2463396005 in the amount of $1,440,000.

27. Given the type of transaction, the SBA 504 Loan was only one component of the financing for the purchase of the Arlington Suites. The State Bank of Texas provided a loan for 50% of the funding (in the amount of approximately $2,000,000), and SHETH provided the remaining $600,000 for the transaction to obtain approval for the SBA Loan. These amounts together totaled the approximate $4,000,000 SHETH used to purchase the Arlington Suites.

7

28.     In or about April of 2009, SHETH's loan went into deferral as SHETH had stopped making payments placing his SBA 504 loan into default. When an SBA loan is in default, the loan becomes subject to the SBA loan liquidation process. One approved liquidation method is the implementation of a "short sale" (i.e., a sale in which the net proceeds are insufficient to cover the outstanding loans secured by the property).

29.     During the course of any approved short sale, the SBA prohibits the collateral from being "sold to the Obligors, Associates or Close Relatives of the Borrower for less than the full amount due on the SBA loan." In short, this means that the SBA will not approve a short sale to a related party or anyone with a business or personal relationship with the seller, in this matter, SHETH. The investigation has shown that SHETH knowingly violated this requirement and defrauded the SBA by arranging to "sell" the Arlington Suites to a related party, LATIF, who was acting in concert with SHETH.

30.     When SHETH defaulted on his SBA 504 loan he negotiated a short sale to a purchasing company named Shubh Laxmi, a corporation controlled by LATIF. As described more fully below, the sale to LATIF was a sham. SHETH maintained ownership and control over the hotel, while LATIF served as a straw buyer who owned the hotel in name only.

31.     In circumstances in which the net proceeds of a sale do not cover the outstanding balance of the SBA loan, the debtor may make an Offer in Compromise to the SBA to satisfy the obligation and obtain a release of the personal guaranty on the loan.

32.     Here, as a result of the Offer in Compromise SHETH negotiated, the SBA charged off over $1 million of the balance SHETH owed on his outstanding SBA 504 Loan Number for the Arlington Suites. Because SHETH maintained beneficial ownership over the

8

Arlington Suites through the fraudulent short sale, the $1 million charge off represented an immediate increase in SHETH's equity in the hotel.

33.     In connection with the Offer-in-Compromise negotiation, SHETH made several false statements and misrepresentations to mislead the SBA about the nature of the buyer. For example, on or about July 17, 2012, SHETH wrote Kathleen Flaherty, the 504 Loan Servicing Officer, representing that "as soon as the expected closing happens" the "BUYER" would "take over the property." As set forth below, however, the investigation showed that SHETH had no intention of giving away ownership and control of the Arlington Suites, but in order to negotiate and ultimately shed over a million dollars in debt, SHETH misled Flaherty, the SBA, and the State Bank of Texas into believing the buyer was a legitimate buyer who would be taking over the property.

34.     Similarly, on or about July 27, 2012, SHETH wrote Flaherty, "As you very well know that I would like to be out of this property ASAP, but between the BANK and SBA disagreement, I don't won't [sic] to lose this buyer." SHETH's push to "resolve this immediately" was a lie because he was not getting "out" of the property, as he falsely represented, but instead would maintain beneficial ownership of the hotel. Accordingly, contrary to SHETH's false assertion, there was no risk of "los[ing]" the buyer because he and LATIF were acting in concert.

35.     Subsequent to the short sale, Shubh Laxmi obtained an SBA 7(a) loan, Loan Number 5840955000, in the amount of $1,960,000, through Hanmi Bank, to finance the purchase. This loan was taken out in the names of Rafid LATIF and Sajida Perveen (LATIF's spouse). A review of the sale documents shows LATIF concealed the fact that SHETH remained the true owner of the Arlington Suites from Hanmi Bank and the SBA, despite having an

9

affirmative obligation to notify the lender of any "[c]hange [in] the ownership structure or interests in the business during the term of the Loan."

36.     Had SHETH and LATIF not fraudulently concealed SHETH's continued ownership of the Arlington Suites and his association with Shubh Laxmi and LATIF, the SBA would have prohibited the short sale to Shubh Laxmi (and the associated $1 million charge-off) and would not have approved the SBA 7(a) loan to Shubh Laxmi.

<u>EVIDENCE OBTAINED FROM CONFIDENTIAL INFORMANT</u>

37.     On or about September 8, 2015, your Affiant interviewed a Confidential Informant ("CI"), who had reported that s/he had information regarding a fraud scheme allegedly executed by SHETH.  CI worked for SHETH at Arlington Suites before, during, and after the short sale to Shubh Laxmi.

38.     CI alleged that in or about 2013, SHETH had fraudulently coordinated a short sale of Arlington Suites from CNH to LATIF using the business name Shubh Laxmi.

39.     CI stated that SHETH had explained to CI that SHETH had sold Arlington Suites to LATIF on paper only, and that although LATIF's name was on the Shubh Laxmi paperwork, he (SHETH) still owned the hotel.

40.     CI explained that SHETH continued operating as the owner of the hotel after the purported short sale and that SHETH used his brother Bobby Sheth to run the "front of the hotel."  CI added that Bobby Sheth lived in an apartment near Sharon Lakes off of South Boulevard.  A review of the NCSOS Articles of Incorporation filing for Shubh Laxmi revealed that the address provided for Shubh Laxmi matched the residential address of Bhavikkumar Sheth, also known as Bobby Sheth.  Additionally, the location of the address is consistent with the description of Bobby Sheth's apartment provided by CI.

10

41.     CI advised that in approximately June of 2014, SHETH also told CI that by short selling the hotel to LATIF on paper only SHETH had been able to get the SBA to write off approximately $1 million in loans that had previously been owed by SHETH. This amount is consistent with what the SBA reported as written off for SHETH's Arlington Suites 504 loan.

42.     CI advised that prior to the short sale to LATIF, SHETH had explained to CI that to accomplish the short sale all SHETH had to do was stop making the loan payments on the SBA loan, and then the SBA would re-negotiate.

43.     CI explained that another way CI knew the Shubh Laxmi sale had been a fraudulent sale from SHETH to a straw purchaser (LATIF) was because after SHETH purportedly sold the Arlington Suites to LATIF, SHETH had a Hindu priest come to Arlington Suites to perform a name-blessing ritual. The only people at the ritual were CI, SHETH, SHETH's wife, an individual named Yogesh Patel, and the Hindu priest. LATIF, the purported new owner of the Arlington Suites, was not present. CI added that the name being blessed was "Shubh Laxmi."

44.     CI also knew LATIF and eventually CI worked for, and became friendly with LATIF.

45.     At a time after the Shubh Laxmi Hindu blessing, LATIF came and visited CI at Arlington Suites and told CI that SHETH was cheating LATIF. LATIF further informed CI that LATIF's name was on SHETH's hotel, and if LATIF wanted to, LATIF could take the hotel out from under SHETH.

46.     After this conversation, CI called SHETH at SHETH's home office in New Jersey and told SHETH that LATIF was upset about money issues with SHETH. In response, SHETH

11

told CI that LATIF would no longer be allowed on the property at Arlington Suites—a hotel your Affiant notes was owned on paper by straw purchaser LATIF.

## CONSENSUALLY RECORDED TELPHONE CALLS

47.    CI made several consensually recorded telephone calls to both SHETH and LATIF. The content of several of the calls are detailed below:

a. On or about September 21, 2015, CI made a telephone call to SHETH. During this conversation, CI talked with SHETH about the Arlington Suites and commented to SHETH that according to LATIF, he (LATIF) had been released from the loan. SHETH commented saying, "yes." SHETH went on to say words to the effect: "I had a loan in his name and I paid it off."

During this conversation, SHETH also alluded to renovations that had been done to the Arlington Suites, and that he (SHETH) was working to open "this thing." CI explained to your Affiant that SHETH was working at the time of the call to have the Arlington Suites Hotel re-badged under the Motel 6 brand name.[3]

b. On or about September 30, 2015, CI made a telephone call to LATIF. During this conversation, CI asked LATIF about the short sale of Arlington Suites to LATIF. LATIF responded initially by saying that he (LATIF) had no idea about how "he" (understood in context to be SHETH) did it. LATIF added that he did know that "he" cheated them. LATIF went on to say that this was done using the name "Shubh Laxmi."

---

[3] Your affiant has confirmed that the Arlington Suites was converted to a Motel 6.

12

The CI asked LATIF what benefit LATIF received for doing the short sale of the Arlington Suites. LATIF stated words to the effect: "I got my money back." When asked by the CI if it was around $400,000, LATIF said "maybe more."[4] Later in the conversation, CI asked LATIF how the SBA becomes convinced to do a short sale. Despite earlier saying he had no idea how "he" did it, LATIF answered that you must convince the SBA that you are unable to pay the bill and then you let them know that you can sell it for "this much." The CI then asked LATIF if that was what "Biren" did. LATIF answered saying, "right," and "that's what he did." LATIF added that if something happens, he (SHETH) was the one who would get in trouble, "not me, I'm the buyer."

Also during the conversation with LATIF, CI referred to the Arlington Suites short sale saying that it was done and over with, and asked LATIF: "he took you off the paper right?" LATIF answered, saying, "right."

c.  On or about October 19, 2015, CI made a telephone call to SHETH. During this conversation, CI and SHETH discussed the new Motel 6-named hotel that had previously been the Arlington Suites. SHETH stated words to the effect: "a very soft opening on Thursday, so out of 4 buildings, open 1 then 2 and 3 and 4 mid-December." SHETH went on to invite CI to a religious ceremony for the new hotel on Thursday of that week.

---

[4] As set forth herein, SHETH wired LATIF $690,000 using two transfers approximately a year after the fraudulent short sale took place after LATIF threatened to expose the fraud.

CI explained to your Affiant that this ceremony being referred to by SHETH was the same type of Hindu ceremony that SHETH had when the hotel was sold to Shubh Laxmi.

d. On or about November 4, 2015, CI made a telephone call to SHETH. During this conversation, CI asked SHETH details about the previous short sale of Arlington Suites to LATIF.

CI asked SHETH if he had had an attorney handle the short sale of Arlington Suites to LATIF or if he SHETH handled it himself. SHETH answered that he (SHETH) did that sale all by himself. SHETH went on to explain that in order to do a short sale like that the seller has to have both the SBA and the primary lender under "your" control.

During the conversation with SHETH, CI stated words to the effect: "I know that you told me the best way to negotiate it is to stop paying the mortgage for a few months." To this SHETH answered, "Yeah." SHETH went on to explain using words to the effect: "You got to have the first bank under your control, then you deal with the SBA. As long as the one is not going to forfeit on you, it's very important to balance both of them." SHETH went on to say words to the effect: "I made the bank agree to sell the property, so we sold it. I make the first and second lender both ready, that there is no valuation, this is the situation with the property, we are going to sell it, and we have a potential buyer, so we sold it." CI asked if the short sale was with the SBA or the bank, too, to which SHETH answered with words to the effect "SBA and the bank too."

14

CI asked SHETH how much money was saved with the short sale of Arlington Suites. SHETH answered saying that Arlington Suites sold for $2.5 million and that he (SHETH) guessed about "one million two" was written off due to the short sale. A review of the records by your Affiant shows that approximately $1.08 million was written off by the SBA as a result of the short sale.

<u>FINANCIAL RECORDS</u>

48.     Your Affiant has reviewed numerous bank records, which provide additional evidence that SHETH maintained control and ownership of the Arlington Suites after the short sale to Shubh Laxmi and that LATIF cooperated in the scheme as a "straw purchaser" only.

49.     On or about October 24, 2012, **a Shubh Laxmi account ending in 6183** was opened at Bank of America ("6183 Account").

    a.     The signature card for this account showed RAFID M LATIF with sole signature authority.

    b.     The address used for the account was the residential address for SHETH's brother, Bobby Sheth.

    c.     Review of activity for the account showed that following the initial deposit of $101.00 on October 24, 2012, there was no activity until February 13, 2013, when $101.00 was transferred to a Bank of America account ending in 4434. No other activity took place in this account.

50.     In or about February 13, 2013, a **Shubh Laxmi Charlotte Inc. Arlington Suites account ending in 4434** was opened at Bank of America ("4434 Account").

15

a. The signature card for this account (opened around the same time as the fraudulent short sale to LATIF) showed BIREN SHETH, President, and ALPANA SHETH, Vice President, as having sole signature authority.

b. The address used was 4416 S. Tryon St., Charlotte, North Carolina—the same address as the Arlington Suites.

c. The account was opened with the $101.00 transfer from LATIF's 6183 Account.

d. A review of activity in the account shows that SHETH used it to make payments to an employee known by your Affiant to have worked at Arlington Suites at the time the payments were made. Other activity included transfers to and from accounts known to your Affiant to be associated with SHETH.

51. In or about February of 2013, a **Shubh Laxmi Charlotte Inc. Payroll Account ending in 2809** was opened at Bank of America ("2809 Account").

a. A review of the Bank of America signature cards showed signature authority for SHETH, Yogesh Patel, and Hiren Patel. SHETH signed the signature card as "President."

b. The address used for the 2809 Account was 4416 S. Tryon Street—the same address as the Arlington Suites.

c. A review of activity in the account indicated that the majority of deposits on a monthly basis into this account came from other Bank of America accounts ending in 2772 and 2812, both of which are in the name of Shubh Laxmi and associated with SHETH, with no connection to LATIF, who had just purchased the Arlington Suites through Shubh Laxmi.

52. On or about February 13, 2013, a **Shubh Laxmi, Inc. Arlington Suites Account ending in 2772** was opened at Bank of America ("2772 Account").

    a. A review of the Bank of America signature cards showed SHETH, President, and Alpana Sheth, Vice President, as having sole signature authority.

    b. A review of this account activity revealed that beginning on or about May 1, 2013, and continuing monthly through at least May of 2015, a direct draft payment of approximately $11,479 was sent from Account 2772 to Hanmi Bank, which was the SBA-backed lender for the straw purchase by LATIF of the Arlington Suites under the name Shubh Laxmi.

    c. As described in greater detail below, this is the account from which SHETH wired two payments totaling $690,000 in March and July 2014 to LATIF with the description "TO PURCHASE HOTEL PROPERTY." Based on my training, experience, and other evidence gleaned during this investigation, your Affiant believes these two wires represent proceeds of the conspiracy's broader illegal activity, which were used as a kickback to LATIF for his role in the illegal activity.

53. The investigation revealed that subsequent to the short sale, LATIF made certain threats based, in part, on his and SHETH's involvement in the fraudulent SBA loan scheme. As a result of additional illegal activity, SHETH and LATIF had approximately $700,000 in proceeds available to purchase hotels. Evidence shows that SHETH and LATIF were not ultimately successful in purchasing any additional hotels with the proceeds and that in early 2014 LATIF was frustrated.

54. On or about March 2, 2014, LATIF wrote an email to an individual named "Mr. Kartha" in which LATIF asked for Kartha's opinion about a letter he was contemplating sending to an attorney associate. In the email, LATIF stated that if SHETH did not transfer "$770,000" into his account "without any conditions," LATIF would "go with criminal proceedings" including a case against SHETH in which LATIF intended to "involve FBI." Among the "matters" LATIF contemplated referring for criminal prosecution were the following:

> 1) The DBA "Subh Lakshmi" [sic] was created in my name, without my signature.
>
> 2) Arlington Inn hotel, short sale - details in next e-mail, and much more, I am compiling it.
>
> 3) Loan application for Hanmi bank, had a fake signature, I have gotten the loan application copy from Hanmi bank, and I am sending it to a private signature analyst. Once, it is proven, we will involve FBI in this case, based on "signature analyst" report.
>
> 4) Getting $770,000 into my account

55. Prior to LATIF's email containing the demand for more than $700,000 and the threats to expose criminal conduct, an email dated February 24, 2014, was sent from LATIF's email account to SHETH in which only the subject line was used for the content. The email referenced the same attorney and contained routing numbers for a BB&T account under LATIF's control. In conclusion, the email stated, "You Did Short Sale Your hotel My Name Please Think About BIREN."

56. Shortly thereafter, SHETH transferred funds to the BB&T account referenced in the February 24 email in a pair of wire transfers. On or about March 14, 2014, SHETH wired $450,000, and on July 21, 2014, SHETH wired $240,000 into LATIF's account. The description for both transfers was "TO PURCHASE HOTEL PROPERTY."

18

## THE INSURANCE FRAUD SCHEME

57.    In connection with the fraudulent short sale of the Arlington Suites, LATIF put up approximately $450,000 in earnest money to facilitate the "sale" of the hotel from SHETH to LATIF using the business name Shubh Laxmi.  The investigation revealed that the $450,000 used to facilitate the fraudulent short sale represented part of the proceeds of an insurance fraud scheme executed by SHETH, LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF.

58.    A review of the Hanmi Bank Shubh Laxmi SBA Loan File revealed a letter dated November 5, 2012, from a closing attorney named Ankim Shah.  The letter contained the following:

> Please be advised that Rafid Latif of Shubh Laxmi Charlotte, Inc. currently has $450,000 in our escrow. The address on file for the account is Mr. Rafid Latif, c/o. Days Inn, 1408 Sugar Creek Road, Charlotte, NC 28262.

59.    The letter included an attachment copy of the front of a PNC Bank Check in the amount of $459,877.18 made out to Sugar Creek Hospitality Inc. from Great American Insurance Company of New York. The check copy had the date of the check blacked out such that the date of the check was not visible.

60.    Your Affiant also reviewed the HUD-1 Settlement Statement maintained by Hanmi Bank for the Shubh Laxmi short sale closing, and it detailed $450,000 in earnest money credited to LATIF.

61.    Your affiant subsequently conducted an investigation into the source of these funds and determined that these funds were a portion of insurance fraud proceeds obtained by the co-conspirators through an elaborate scheme utilizing sham company names, invoices and bank accounts.  Evidence obtained during this portion of the investigation shows that the insurance fraud scheme provided SHETH, LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF with approximately $795,000 dollars in proceeds, a portion of which was used as the earnest money to

19

facilitate the short-sale scheme and the remainder of which DEFENDANTS laundered through various accounts and used for their own benefit.

62.     On or about August 8, 2010, SHETH initiated a claim for damage allegedly caused by a storm days earlier to 50 rooms at a Days Inn SHETH owned located at 1408 West Sugar Creek Road in Charlotte, North Carolina.  The claim listed the insured address as SHETH's home address with the damaged business being the "Days Inn Charlotte."  SHETH owned the hotel through Sugar Creek Hospitality LLC.

63.     LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF were involved in the operation of SHETH's Days Inn Hotel.  Specifically, LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF formed a corporation called Kinza, Inc., through which they operated the Days Inn.[5] As set forth below, the investigation revealed that DEFENDANTS created fake invoices and made false transfers between Kinza/Days Inn bank accounts and bank accounts opened in fictitious business names to provide to GAIC in connection with their fraudulent scheme.

64.     Internal correspondence between the GAIC-hired claims adjuster and GAIC dated October 14, 2010, included a copy of an August 8, 2010 re-roofing contract signed by IMTIAZ SHAREEF.  Also attached was a roofing invoice copy dated August 10, 2010, totaling $72,050.00 for roof-related repairs claimed to have been paid by the insured and included in the claim to GAIC.

65.     Your affiant believes that in order to support any further inquiries by GAIC into this particular claimed expense for the roof, the co-conspirators wrote three checks that were

---

[5]In or about November 2012, LATIF, through Kinza, purchased the Days Inn from SHETH and obtained another SBA 7(a) loan, Loan Number 5509345005

20

designed to falsely appear to support the claim of this roof payment. The details of these transactions are as follows:

a. On or about November 15, 2010, EJAZ SHAREEF opened a TD Bank business account ending 4009 in the name of Advanced Improvements & Restoration LLC (AI&R) using a deposit of a $28,820.00 check drawn off of a Kinza/Days Inn PNC Bank account ending in 7433. The check was falsely backdated to "8-5-10" and the memo contained the words "40% Payment for Roof New Roof." This check was signed by IMTIAZ SHAREEF.

b. Also, on or about November 15, 2010, EJAZ SHAREEF opened a Bank of America (BoA) Business Checking Account ending with the numbers 7865 in the name of AI&R using a deposit of a $25,217.50 check drawn off of the Kinza/Days Inn 7433 PNC account. The check was falsely backdated to "8-10-10" and the memo contained the words "35% for Roof New Roof." This check was signed by IMTIAZ SHAREEF.

c. One day later, on or about November 16, 2010, a Kinza/Days Inn -7433 PNC check signed by IMTIAZ SHAREEF was deposited into the AI&R BoA -7865 account. This check was also falsely backdated.

66. Based on training, experience, and the patterns of activity uncovered in this portion of the investigation, your Affiant believes that AI&R was a fictitious business name created and used by DEFENDANTS to falsely fabricate the appearance of actual repair and restoration payments being made to/or through a restoration company, such that it would appear to GAIC (or anyone who sought to verify) that actual funds had been spent as a result of the damage. In reality, IMTIAZ SHAREEF and EJAZ SHAREEF merely deposited money from

one account under their control to another account under their control and were never out any money. DEFENDANTS accomplished this by drafting and depositing the fictitious checks through and to various FDIC-insured banks as described herein.

67.     As set forth below, DEFENDANTS continued a pattern of using false invoices and corresponding checks with GAIC similar to the above-described activity for the duration of their successful scheme to defraud GAIC of insurance funds.

68.     The GAIC insurance file contained an invoice dated October 11, 2011, from a company named United Remolding in the amount of $549,146 for "Interior Repairs of 49 water damaged rooms, Main Laundry room, Maintenance Rooms." The invoice shows that $367,956.40 had been already paid with two checks. To further support that this invoice had been paid, a copy of two checks were provided by the co-conspirators to GAIC. These are as follows:

    a.  Check number 849, falsely back dated to March 8, 2011 in the amount of $183,978.20 made out to United Remolding for "1st Payment for Water Damaged Rooms," signed by IMTIAZ SHAREEF drawn off of the Kinza/Days Inn BB&T account ending in 9271.

    b.  Check number 877, falsely back dated to June 21, 2011 in the amount of $183,978.20 made out to United Remolding for "2nd Payment For Repairs," signed by IMTIAZ SHAREEF drawn off of the Kinza/Days Inn BB&T account ending in 9271.

69.     Your Affiant reviewed associated banking records and determined that these checks were not used for the purpose represented to GAIC. Instead, the checks were deposited

on October 28, 2011, and November 1, 2011, respectively into another AI&R account at BB&T ending in 2939. EJAZ SHAREEF opened the AI&R BB&T account on or about June 24, 2011.

70.     Further review of the AI&R BB&T account revealed that only days after the above-described checks were deposited, nearly the full amount of these funds were transferred right back to the Kinza/Days Inn BB&T 9271 account from which the checks were drawn. Further review of the copies of these checks provided to GAIC revealed that these bank documents were altered to falsely represent to GAIC that these checks had cleared in early 2011 as payment for repair work that was submitted in the insurance claim

71.     Further review of the GAIC file revealed three invoices for furniture and furnishings from a company named NC Furniture Mart:

    a.   Invoice #142312, dated September 4, 2011, for $48,400;

    b.   Invoice #187612, dated October 20, 2011, for $48,000; and

    c.   Invoice #132376, dated January 20, 20112, for $48,400.

72.     Along with the invoices in the GAIC file were copies of three checks:

    a.   Check number 1384, falsely back dated to August 30, 2011, drawn off of Kinza/Days Inn PNC Bank Account ending in 7433 in the amount of $48,335.00, made out to N.C. Furniture Mart with the memo "Payment For 16 Rooms Furniture Invoice #142312."

    b.   Check number 1390, falsely back dated to October 18, 2011, drawn off of Kinza/Days Inn PNC Bank Account ending in 7433 in the amount of $48,335.00, made out to N.C. Furniture Mart with the memo "Invoice 187612 16 Rooms Complete Furniture."

c. Check number 1389, falsely back dated to January 17, 2012, drawn off of Kinza/Days Inn PNC Bank Account ending in 7433 in the amount of $48,335.00, made out to N.C. Furniture Mart with the memo "Payment For 16 Complete Rooms Invoice 132376."

73. Each of these three checks (1384, 1389 and 1390) were endorsed with the fictitious name "JACK ROY." Further review of the copies of these three checks provided to GAIC revealed that the bank document copies were altered to falsely represent to GAIC that these checks had cleared earlier than they had in reality.

74. These three checks drawn on PNC Bank were never deposited by any company named N. C. Furniture Mart, nor was your affiant able to identify anyone named Jack Roy associated with any such company. Rather, bank records show that all three of these fictitious checks were deposited in late January and in early February 2012 into the BB&T Kinza/Days Inn account ending in 9271.

75. The negotiation of these fictitious checks by the coconspirators caused PNC bank to process funds that were subsequently deposited into the Kinza/Days Inn BB&T account. LATIF and IMTIAZ SHAREEF have signature authority for this account. As with the other previously described falsified/fictitious checks, the funds associated with these three checks never left DEFENDANTS' possession, but were merely moved from one bank account to another all under their control. Instead, the investigation showed these N.C. Furniture Mart invoices and the corresponding checks were all falsified documents provided to GAIC by DEFENDANTS in furtherance of the scheme to obtain insurance proceeds.

76. In addition to the invoices and checks described in detail herein, your Affiant has reviewed and identified approximately ten (10) other similarly-used falsified/fictitious checks

24

that added to the appearance of payments made to companies associated with purchases, repairs, and/or restoration of the Days Inn. In each of these instances the funds were merely churned through FDIC-insured banks and corresponding accounts controlled and utilized by LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF.

77. As a result of DEFENDANTS' extensive insurance fraud scheme, GAIC released a series of checks, including the check used by LATIF as earnest money for the Shubh Laxmi SBA loan to promote the fraudulent short sale of the Arlington Suites.

78. GAIC check number 909-133334 dated February 2, 2011 for $459,877.18 was made out to Sugar Creek Hospitality, Kinza and AmeriClaims. Check reads: "ACV PYMNT ON BLDG & CONTENTS ON 8/5/10 STORM LOSS."

79. The check was deposited on April 29, 2011 into the Shah Desai Attorney Trust Account and was endorsed by SHETH, IMTIAZ SHAREEF, and an individual named Robert Freitag with AmeriClaims, Inc.

80. Your Affiant believes based on training and experience that the copy of this check provided to Hanmi Bank/SBA had the date blacked out as it could have alerted Hanmi/SBA to the fraud as it was dated approximately a year and a half prior to the attorney letter representing the funds were in escrow credited to "Rafid Latif of Shubh Laxmi" in the attorney letter.

81. In addition, GAIC issued several other checks to cover the claim and payments LATIF, IMTIAZ SHAREEF, and EJAZ SHAREEF documented through fraud:

    a. GAIC check number 909-160881, dated April 12, 2011, for $160,569.46 to Sugar Creek Hospitality, Kinza, and AmeriClaims reads: "ACV PMT ON BLDG. CONTENTS & SIGN DMG FROM AUGUST 5, 2010 WIND STORM." This

check was deposited on September 6, 2011, into Kinza BB&T account ending in 9271 and was endorsed by EJAZ SHAREEF, IMTIAZ SHAREEF, and Freitag.

b.  GAIC check number 909-235333, dated August 24, 2011, for $1,266.00 to Sugar Creek Hospitality, Kinza, and AmeriClaims reads: "UNDISPUTED AMOUNT OF LOSS OF INCOME DUE TO 8/5/10 WIND STORM" This check was deposited on October 24, 2011 into Kinza BB&T Account ending in 9271 and was endorsed by EJAZ SHAREEF, an illegible signature (possibly IMTIAZ), and Freitag.

c.  GAIC issued check #909-273051, dated October 25, 2011 for $28,734.00, to Sugar Creek Hospitality, Kinza, and AmeriClaims reads: "PAYMENT FOR LOSS OF INCOME DUE TO 8/5/10 WIND STORM PER SIGNED RELEASE." This check was deposited on November 9, 2011, into Kinza BB&T Account ending in 9271 and was endorsed by EJAZ SHAREEF, IMTIAZ SHAREEF and Freitag.

d.  GAIC issued check #909-305388, dated December 19, 2011, in the amount of $129,705.71 issued payable to Sugar Creek d/b/a Days Inn, and AmeriClaims reads: "PAYMENT OF HOLDBACK ON THE BLDG DAMAGE DUE TO 8/5 WIND STORM." This check was deposited on January 17, 2012 into Kinza BB&T account ending in 9271 and was endorsed by IMTIAZ SHAREEF, EJAZ SHAREEF and Freitag.

e.  GAIC issued check #909-349926, dated March 6, 2012, in the amount of $15,282.98 issued payable to Sugar Creek Hospitality, Kinza, and AmeriClaims. Check reads: "PAYMENT OF HOLDBACK ON THE SIGN FOR THE 8/5/10

STORM DAMAGE." This check was deposited on March 26, 2012 into BB&T

KINZA account ending in 9271 and was endorsed by EJAZ SHAREEF, IMTIAZ

SHAREEF and Freitag.

82.     The six checks received by the co-conspirators from GAIC total $795,435.33 and

represents proceeds of the insurance fraud scheme.

83.     Your Affiant reviewed bank records associated with LATIF, IMTIAZ SHAREEF

and EJAZ SHAREEF to determine how the illegal proceeds were utilized.  Rather than being

used for repairs or restoration of the Days Inn, the funds were subsequently laundered through

various accounts to conceal the nature, location, source, ownership, and control of the proceeds

of insurance fraud scheme and were spent for the benefit of DEFENDANTS, including

expenditures in furtherance of the operation of IMTIAZ SHAREEF and EJAZ SHAREEF's auto

sales business.

## CONCLUSION

84.     Based on the details set forth herein, your Affiant submits there is probable cause

to believe that from at least in or about April 2009 to the present, in Mecklenburg County, within

the Western District of North Carolina, DEFENDANTS and others known and unknown did

knowingly and intentionally combine, conspire, confederate, and agree to defraud the United

States Small Business Administration and to commit offenses against the United States,

including violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire

fraud), and 1344 (bank fraud), all in violation of Title 18, United States Code, Section 371.

85.     Your Affiant further submits there is probable cause to believe that from in or

about August 2010 through the present, in Mecklenburg County, within the Western District of

North Carolina, and elsewhere, DEFENDANTS did knowingly combine, conspire,

27

confederate, and agree with each other and others known and unknown, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity and to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(h).

86.    In light of the forgoing, your Affiant submits that there is probable cause for issuance of Arrest Warrants for BIREN SHETH, RAFID LATIF, IMTIAZ SHAREEF and EJAZ SHAREEF.  Therefore, your Affiant requests that the Court issue the proposed arrest warrants.

28

## REQUEST FOR SEALING

87.     Your Affiant further requests that the Court order that all papers in support of this application, including the Affidavit and arrest warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

_____
Michael D. McNeely
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on _April 2_____ , 2018


_____
THE HONORABLE DAVID S. CAYER
UNITED STATES MAGISTRATE JUDGE